UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID HAUSMANN,                    )
                                   )
            Plaintiff,             )
                                   )
        vs.                        )        No. 4:06-CV-1620 (CEJ)
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On January 9, 1998, plaintiff David Hausmann filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq. After a hearing, an Administrative Law Judge ("ALJ") found that plaintiff suffered from right sternoclavicular subluxation, overuse syndrome of the wrists, low back strain, schizoaffective disorder, dysthymic disorder and alcoholism in remission. (Tr. 42). On January 14, 1999, the ALJ awarded disability benefits to plaintiff, concluding that plaintiff's impairments precluded him from engaging in any type of competitive work activity and that plaintiff lacked transferable skills that would enable him to perform other work within his physical and mental residual functional capacity. (Tr. 42). The ALJ stated in the decision that plaintiff's case would be reviewed within a year.

On July 19, 2002, the Commissioner found that plaintiff's disability would cease effective September 2002. (Tr. 297-300). In a decision letter, the Commissioner informed plaintiff that, in spite of his impairment, "the medical evidence shows that [he is] able to return to [his] past job in shipping and receiving/installation." (Tr. 298). Plaintiff filed a request for reconsideration, which was denied on December 30, 2002. (Tr. 264-66). Plaintiff requested a hearing before an ALJ. (Tr. 263). Plaintiff appeared and testified before an ALJ in March 2004. (Tr. 433-459). The ALJ found that plaintiff's impairments had medically improved and he was not under a disability at any time after July 2002. (Tr. 412-413).

On July 14, 2005, the Appeals Council remanded the case for further consideration. (Tr. 391). The Appeals Council noted that the ALJ's decision failed to contain an evaluation of one of the examining physician's conclusions regarding plaintiff's ability to perform simple tasks. (Tr. 391). The Appeals Council stated that the ALJ, upon remand, could request the examining source to provide additional evidence if necessary. (Tr. 392).

On remand, a different ALJ reviewed plaintiff's case *de novo*. (Tr. 462). Plaintiff was represented at the hearing and testified in response to questions from his counsel and the ALJ. (Tr. 460-489). A vocational expert also provided testimony. (Tr. 480-81). On December 9, 2005, the ALJ issued a decision ruling that plaintiff's disability had ceased on July 15, 2002, and that his entitlement to a period of disability and disability insurance

ended in September 2002. (Tr. 16-27). The Appeals Council denied plaintiff's request for review. (Tr. 4-7). Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

The following evidence was presented to the ALJ.

Plaintiff was born on September 15, 1953. (Tr. 80). Plaintiff's had been married for six years, but the marriage ended in divorce. (Tr. 382). He had no children. (Tr. 382). Both of plaintiff's parents were deceased and he has no siblings. (Tr. 382). At the time of the hearing, plaintiff had a girlfriend but they do not live together. (Tr. 476).

Plaintiff lived alone in his parents' former home, which he inherited after his father committed suicide. (Tr. 464-65). Plaintiff earned a B.A. degree in psychology in 2002, and he had been working on a master's degree in sociology. (Tr. 465-66). At the time of the hearing, he had stopped taking classes because of legal issues that required his attendance. (Tr. 465).

Plaintiff was self-employed as an electronics repair technician from 1992 through 1997. (Tr. 466). He inherited his family's electrical appliance repair business in 2000. (Tr. 381). Plaintiff was later arrested when police found marijuana at the business. (Tr. 381). During this arrest, plaintiff reached for a gun and threatened to kill himself. (Tr. 370, 381). Plaintiff was placed on probation. (Tr. 469).

Plaintiff admitted that he had a history of using illicit drugs, including marijuana, methamphetamine and cocaine. (Tr. 470). He also testified that he consumed alcohol heavily until 1995 when he quit drinking. However, he also testified that he hadn't "drank heavily since 1997." Plaintiff testified that he had been in "detox" twice, with the last time being in 2004. (Tr. 470-471).

Plaintiff testified that he has "good days" and "bad days". (Tr. 476). On a "good" day, plaintiff awakens around 11:00 a.m., and does general housework. (Tr. 477). Plaintiff testified that he cannot go outside of his home in the daylight because his neighbors would be watching him and he feared being arrested by the police. (Tr. 477). Plaintiff was able to pay the bills, do household cleaning, laundry and prepare simple meals. (Tr. 341, 478). Plaintiff spent time gardening, writing stories, watching television, listening to music, playing board games and doing work on the computer. (Tr. 342, 347, 478). He went shopping once a month or sometimes less frequently. (Tr. 341). Plaintiff stated that he can sit for approximately twenty minutes before he has to use the restroom. (Tr. 479). However, plaintiff felt that he could walk ten miles a day or "indefinitely". (Tr. 479). When plaintiff does leave his home he usually takes the bus or walks. (Tr. 342).

On a "bad day", plaintiff sleeps for eighteen to twenty-four hours. (Tr. 476-77). He is unable to go shopping on bad days. (Tr. 341). Plaintiff testified that he goes into severe depression

on these "bad days" and cannot even leave his bed other than to use the restroom. (Tr. 475). He stated that his moods change in three month cycles, with the worst time being around Thanksgiving. (Tr. 475). He also testified that August is a particularly depressing month because both of his parents died in August. (Tr. 475). However, his mood improves between August and Thanksgiving. (Tr. 475).

Barbara Myers, a vocational rehabilitation consultant, testified at the hearing as a vocational expert. (Tr. 480). Ms. Myers had not met plaintiff prior to the hearing. (Tr. 481). She had, however, listened to plaintiff's testimony and reviewed his file. (Tr. 480). Ms. Myers stated that plaintiff possessed transferable work skills in television, radio, and electrical appliance repair. (Tr. 483). Ms. Myers testified that, if plaintiff's mental impairment limited him to medium exertional work of an unskilled nature, he would not be able to perform any of his past relevant work. (Tr. 483-84).

The ALJ posed the following hypothetical question to Ms. Myers:

> If the hypothetical individual was limited to medium exertional work and it was unskilled and that same individual, but have occasional contact with the public, are there any jobs on a regional and national level that, that particular hypothetical individual could perform?

(Tr. 484). Ms. Myers believed that the hypothetical individual could find work as a sandwich maker, industrial cleaner, or laundry worker. (Tr. 484-85).

The ALJ next asked Ms. Myers about jobs available to a hypothetical individual limited to light, unskilled work, with only occasional contact with the public. (Tr. 485). Ms. Myers opined that work would be available as a folding machine operator, a cleaner housekeeper, or a flat work finisher. (Tr. 485). Ms. Myers stated that none of these positions required the use of fine, dexterous movements. (Tr. 485).

### III. **Medical Records**

On May 29, 1997, Kapal Datta, M.D., concluded that plaintiff suffered from Major Depressive Disorder, recurrent, with a history of alcohol and substance abuse. (Tr. 221). However, plaintiff was described as well-groomed and cooperative with normal speech patterns. (Tr. 219). Dr. Datta found that plaintiff had "fair" insight and that plaintiff's level of suicide risk was "nil". (Tr. 221). Plaintiff had no hallucinations or delusions. (Tr. 221). Dr. Datta found that plaintiff had a Global Assessment of Functioning (GAF)[1] score of 70.[2] (Tr. 221).

---

[1]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[2]A GAF score of 61 to 70 indicates mild symptoms (depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning fairly well and involved in meaningful relationships. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

On June 12, 1997, plaintiff reported to Dr. Datta that he was doing "very fine" and that he was keeping busy. Plaintiff's mood was described as "very good, happy." (Tr. 216). He was sleeping for seven to eight hours a day, waking up fresh, and his appetite was normal. (Tr. 216). Plaintiff was given a prescription for Zoloft[3]. (Tr. 217).

Plaintiff again told Dr. Datta that he was doing "fine" on August 7, 1997. (Tr. 213). On September 18, 1997, plaintiff reported a good mood. (Tr. 212). He was still eating and sleeping without incident. (Tr. 212). Plaintiff stated that he enjoyed life. (Tr. 212).

On November 13, 1997, plaintiff told Dr. Datta that he was doing well with his medication. (Tr. 210). Plaintiff's condition was described as Dr. Datta as "very good". (Tr. 210-11). Plaintiff's mood was described as "happy" on December 11, 1997. (Tr. 208). Nevertheless, Dr. Datta described plaintiff's prognosis as "guarded". (Tr. 203). Plaintiff again indicated that his medication was helpful on a February 17, 1998, visit to Dr. Datta. (Tr. 206). During a visit on April 16, 1998, plaintiff told Dr. Datta that the Zoloft was working well. (Tr. 204). Plaintiff referred to it as a "miracle" medicine. (Tr. 204).

Joseph Shuman, M.D., examined plaintiff on June 4, 1998. (Tr. 191). Plaintiff reported that his medications included Zoloft,

---

[3]Zoloft is the tradename for a medicine containing sertraline, used to relieve mental depression. PDR Medical Dictionary 1624 (2d. ed. 2000).

Xanax[4], and Wellbutrin[5]. Plaintiff was found to be alert, coherent and logical, although he tended to talk too much. Plaintiff's affect and his responses to questions were described as "enthusiastic." (Tr. 192). According to the report, plaintiff told Dr. Shuman that he was not seeking work because of his shoulder injury and because he was "working with vocational rehab and expects to go back to school." (Tr. 193). Dr. Shuman found that plaintiff's GAF, with medication, was 85.[6] (Tr. 193)

Plaintiff presented to Dr. Datta on August 31, 1998, stating that he was doing fine. (Tr. 189). Plaintiff reported that he was busy taking classes. (Tr. 189). Plaintiff's mood was described as "very good". (Tr. 189).

In a medical assessment of plaintiff's ability to engage in work related activities completed in October 1998, Dr. Datta opined that plaintiff had, at best, a poor ability to follow work rules, use judgment, deal with work stresses, function independently, and maintaining attention. (Tr. 183). Plaintiff's ability to deal with the public, relate to coworkers, and interacting with supervisors was rated as fair. (Tr. 183). Dr. Datta stated that

---

[4]Xanax, or Alprazolam, is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[5]Wellbutrin, or bupropion hydrochloride, is an anti-depressant widely used to aid in smoking cessation. PDR Medical Dictionary 258 (2d. ed. 2000).

[6]A GAF score of 81-90 indicates minimal or no symptoms, with good functioning in all areas. The individual is involved in a wide range of activities, socially effective and satisfied with life. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

plaintiff was unable to handle even a minimum amount of stress. (Tr. 184).

James Hurley, Ph.D., a licensed psychologist, examined plaintiff on November 12, 1998. (Tr. 172-180). Dr. Hurley's diagnoses were schizoaffective disorder[7], dysthymic disorder[8], rule out bipolar disorder and alcoholism in remission[9]. (Tr. 174). Dr. Hurley found that plaintiff had a GAF of 50.[10] (Tr. 174).

On November 25, 2002, Ofelia E. Gallardo, M.D., wrote that plaintiff had depressive disorder not otherwise specified, a substance addiction disorder, and schizotypal traits.[11] (Tr. 276). Dr. Gallardo found that plaintiff would have moderate restrictions in social functioning and mild difficulties in concentration and persistence. (Tr. 286).

L. Lynn Mades, Ph.D., a licensed psychologist, met with plaintiff on July 12, 2002. (Tr. 344-349). Plaintiff complained

---

[7]Having an admixture of symptoms suggesting both schizophrenia and affective (mood) disorder. PDR Medical Dictionary 1600 (2d. ed. 2000).

[8]A chronic disturbance of mood characterized by mild depression. PDR Medical Dictionary 526 (2d. ed. 2000).

[9]When a disease is referred to as in remission, it indicates that there has been an abatement or lessening in the severity of symptoms. PDR Medical Dictionary 1548 (2d. ed. 2000).

[10]A GAF score of 41 to 50 indicates serious symptoms or impairments. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000)

[11]There is very little in the record regarding any medical evidence between Dr. Hurley's 1998 report and Dr. Gallardo's 2002 report. The Court notes that plaintiff was found disabled in January 1999 and his disability is alleged to have ceased in June 2002.

of low back strain, depression and schizoaffective disorder. (Tr. 344). Plaintiff told Dr. Mades that his medication was helping. (Tr. 345). Plaintiff stated that he had returned to school and was having no behavioral problems in class. (Tr. 345). Plaintiff reported that he was getting along with others without incident. (Tr. 347). Plaintiff's mood was described as euthymic.[12] (Tr. 346). No mood disturbance was apparent. (Tr. 346). Plaintiff admitted to some suicidal thoughts without any intent or plan to act on them. (Tr. 347). Dr. Mades diagnosed plaintiff with depressive disorder, not otherwise specified, alcohol dependence in sustained partial remission, cannabis abuse, and polysubstance dependence in sustained full remission. (Tr. 348). Dr. Mades also believed that plaintiff suffered from a personality disorder, not otherwise specified, with schizotypal traits[13]. (Tr. 348). Dr. Mades noted that there "was evidence of no psychological impairment that would limit the claimant from engaging in sustained employment." (Tr. 348). Dr. Mades opined that plaintiff appeared "able to perform simple, manual tasks with limited interactions with others." (Tr. 348). Plaintiff's prognosis was described as fair with appropriate treatment, so long as plaintiff abstained from substance use. (Tr.

---

[12]Euthymia refers to joyfulness and mental peace, or moderation of mood; not manic or depressed. PDR Medical Dictionary 627 (2d. ed. 2000).

[13]Behavior characterized by discomfort with close relationships and cognitive distortions. PDR Medical Dictionary 528 (2d. ed. 2000)

348). If plaintiff did not, the prognosis was guarded. (Tr. 348).
Dr. Mades found plaintiff's GAF to be within a 75-80 range.[14]

A week later, on July 19, 2002, a mental residual capacity
questionnaire was completed by Judith McGee, Ph.D. (Tr. 302-305).
Dr. McGee found that plaintiff was moderately limited in the
ability to work in coordination with others without being easily
distracted by them. (Tr. 302). Plaintiff also had moderate
limitations in completing a normal workday or workweek without
interruption and the ability to get along with coworkers without
distracting them from their duties. (Tr. 303). For all other
traits, plaintiff was described as "not significantly limited".
(Tr. 302-03). In August 2002, Dr. McGee noted that plaintiff had
depressive disorder and a personality disorder with schizotypal
traits. (Tr. 306). Dr. McGee found only mild restriction in
activities of daily living, difficulties in maintaining social
functioning and difficulties in maintaining concentration. (Tr.
316).

Plaintiff was arrested on January 30, 2003, for an alleged
drug violation. When he threatened suicide, the police took him to
the Hyland Behavioral Health Center at St. Anthony's Medical
Center. Plaintiff was seen by Steven A. Harvey, M.D., and reported
that he "felt fine almost immediately after admission." (Tr. 368).

_____

[14]A GAF score of 71 to 80 applies when there is no more than
a slight impairment in social, occupational, or school
functioning. Symptoms are transient and expectable (trouble
concentrating after family argument, etc). See Am. Psychiatric
Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34
(4th ed. text rev. 2000).

Plaintiff told Dr. Harvey that he had "simply become upset over his arrest and that is why he felt suicidal." (Tr. 370). Plaintiff was taking Xanax and Zoloft, which he described as a "wonder drug" that had resulted in his consistent improvement. (Tr. 370).

Dr. Harvey found that plaintiff was euthymic and stable upon admission. (Tr. 371). Plaintiff's judgment and insight were fair, and he had no suicidal ideations. (Tr. 371). Dr. Harvey wrote that plaintiff "might have been simply malingering[15] suicidal impulses as a short-term measure to thwart his arrest." (Tr. 371). Dr. Harvey found that plaintiff suffered from major depression, recurrent, along with marijuana and alcohol dependence and possible malingering. (Tr. 371). Plaintiff's GAF was 70.

Plaintiff was discharged from the Hyland Center on January 30, 2003. (Tr. 368-69). Upon discharge, Dr. Harvey noted that plaintiff was "already essentially asymptomatic" several hours after admission, and that plaintiff had "hinted that he wanted to be in the hospitalization [sic] for a little while in order to check out his legal circumstances and try to make sure that he was not going to be arrested as soon as he left the hospital." (Tr. 368). Plaintiff did well while in the hospital, and he denied any suicidal ideation. The discharge diagnoses were depression not otherwise specified, in remission, alcohol and marijuana dependence, crack cocaine abuse, and malingering. (Tr. 368).

_____

[15]Malingering refers to feigning illness or disability in order to escape work, to excite sympathy, or to gain some sort of compensation or advantage. PDR Medical Dictionary 1058 (2d. ed. 2000)

-12-

A psychiatric intake evaluation was performed by Hilary Klein, M.D., and Lisa Delaney, M.D, on July 17, 2003. (Tr. 318-83). Plaintiff reported that he had stopped seeing his psychiatrist a year earlier, but he had enough medicine that he could take if he began feeling depressed. (Tr. 381). Plaintiff reported that he was depressed, although not as depressed as he had been in 1995 or in 1997. (Tr. 381-82). He reported having some suicidal thoughts, but stated that he had no present intent to commit suicide. (Tr. 382). Plaintiff had no homicidal ideation, no delusions, and no hallucinations. (Tr. 383). Plaintiff exhibited fair judgment. (Tr. 383). Plaintiff's GAF score was designated as 40.[16] (Tr. 383). Plaintiff reported that the reason for his visit was to acquire medicine for his depression. (Tr. 381). Plaintiff was given an increased prescription for Zoloft and a renewed Xanax prescription. (Tr. 383).

Plaintiff was seen by James Conour, M.D., on August 1, 2003. (Tr. 384). Plaintiff reported that he was eating and sleeping well, and that he was feeling better than he had felt in the previous months. (Tr. 384). Plaintiff planned to re-enroll in graduate school in the fall and he was trying to start his own electric scooter business. (Tr. 384). Dr. Conour diagnosed plaintiff with depressive disorder, recurrent, but noted that it was in partial remission. (Tr. 384). Dr. Conour also noted that

---

[16]A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

plaintiff had a history of marijuana and alcohol abuse, both in remission. (Tr. 384).

Plaintiff visited Dr. Conour again on September 12, 2003. (Tr. 379). Plaintiff was eating and sleeping well. (Tr. 379). School was going well. (Tr. 379). Dr. Conour found that plaintiff's judgment and insight were "good". (Tr. 379). Plaintiff was noted to have depression and anxiety. (Tr. 379).

On October 17, 2003, plaintiff again reported to be sleeping well. (Tr. 380). Plaintiff felt upbeat and discussed his desire to leave a positive legacy. (Tr. 380). Plaintiff's mood was good. (Tr. 380). Dr. Conour again noted that plaintiff's depression was in partial remission. (Tr. 380). Plaintiff had a history of alcohol and marijuana abuse. (Tr. 380).

On November 14, 2003, plaintiff stated that he was doing very well with Zoloft. (Tr. 378). On November 21, 2003, plaintiff's mood was described as euthymic. (Tr. 378). Plaintiff's anxiety was being controlled. (Tr. 378). Plaintiff's diagnosis remained major depressive disorder recurrent, in partial remission. (Tr. 378).

Plaintiff was admitted to Saint Louis University Hospital on December 16, 2003, after coming to the emergency room with suicidal thoughts. (Tr. 358). His GAF score upon admission was 30.[17] (Tr.

---

[17]A GAF score of 21 to 30 indicates that the individual exhibits behavior considerably influenced by delusions or hallucinations or serious impairment in judgment, or an inability to function in almost all areas. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

358). His highest GAF score in the preceding year was reported at 75. (Tr. 358). Plaintiff denied hallucinations or delusions; he reported feelings of worthlessness and hopelessness. (Tr. 358). Plaintiff stated that he had slept for twenty-four hours straight after staying awake for three full days to work on his term paper. (Tr. 358). Plaintiff stated that the end-of-semester papers had stressed him out. (Tr. 358-59).

On examination, plaintiff's mood was described as "depressed and scared". (Tr. 361). However, he had an euthmyic affect. (Tr. 361). Plaintiff denied any specific intent to commit suicide. (Tr. 361). Plaintiff responded well to medication and felt that his mood had significantly improved. (Tr. 363). Plaintiff was discharged on December 23, 2003, with a GAF score of 50-60. (Tr. 358).

A Mental Impairment Questionnaire was completed by Dr. Conour on January 15, 2004. (Tr. 373-76). Plaintiff's GAF scored between 65 and 70. (Tr. 373). Dr. Conour's diagnosis for plaintiff was depression, panic attacks, and substance abuse. (Tr. 373). Dr. Conour noted that plaintiff exhibited a moderate response to his medication and treatment. (Tr. 373). When asked to describe clinical findings that demonstrate the severity of plaintiff's mental impairment, Dr. Conour noted that plaintiff was able to enroll in graduate school. (Tr. 373). Plaintiff's prognosis was stable. (Tr. 374).

Dr. Conour indicated that plaintiff was able to perform activities of daily living with, at most, only mild restrictions.

(Tr. 375). Dr. Conour opined that plaintiff had moderate difficulty in maintaining social functioning and moderate deficiencies of concentration. (Tr. 375). It was estimated that plaintiff's limitations would cause him to be absent from work about two days per month. (Tr. 376). Dr. Conour denied that plaintiff was a "malingerer". (Tr. 376).

On October 1, 2004, treatment notes from Dr. Conour indicate that plaintiff's marijuana use was continuing. (Tr. 424). Plaintiff's diagnosis was borderline personality disorder[18], panic attacks, and marijuana abuse. (Tr. 424).

A treatment plan review dated November 10, 2004, described plaintiff's GAF score at 75. (Tr. 426). His current medications included Zoloft and Clonazepam[19]. (Tr. 426). Plaintiff indicated that he was satisfied with his treatment, although he disagreed with Dr. Conour's opinion that plaintiff no longer needed to take Clonazepam. (Tr. 426). His marijuana and alcohol abuse was noted to be in remission, although it was unclear whether plaintiff had used these substances recently. (Tr. 426). Plaintiff's diagnosis remained major depressive disorder, recurrent, moderate. (Tr. 426). Plaintiff exhibited ongoing suicidal ideation, but denied homicidal ideation. (Tr. 426). Plaintiff was noted to have difficulty

---

[18]Borderline Personality Disorder (BPD) is characterized by impulsive and unpredictable behavior, unstable relationships and uncontrollable affect. PDR Medical Dictionary 526 (2d. ed. 2000)

[19]Clonazepam, or Klonopin, is a benzodiazepine prescribed for treatment of seizure disorders and panic disorders. See Phys. Desk Ref. 2782 (60th ed. 2006).

handling challenges and coped with his stress through excessive sleep. (Tr. 426).

Treatment notes from plaintiff's January 7, 2005, visit with Dr. Conour reflect a diagnosis of borderline personality disorder. (Tr. 423). On January 27, 2005, plaintiff's diagnoses included borderline personality disorder and depression not otherwise specified. (Tr. 422). Plaintiff's condition had improved. (Tr. 422)

On February 10, 2005, plaintiff was again seen by Dr. Conour. (Tr. 421). Plaintiff was having few self-destructive thoughts. (Tr. 421). Plaintiff reported that he was still involved in a relationship. (Tr. 421). His diagnosis remained borderline personality disorder. (Tr. 421). Plaintiff was eating and sleeping well. (Tr. 421). On March 17, 2005, plaintiff stated that his relationship was going well. (Tr. 421). His diagnoses included borderline personality disorder and substance abuse. (Tr. 421).

Plaintiff visited Dr. Conour on April 15, 2005. (Tr. 420). Plaintiff was feeling good overall. (Tr. 420). His anxiety was considered "better". (Tr. 420). Plaintiff reported his finances were acceptable, noting that he had done some electronics jobs for automobiles. (Tr. 420). Plaintiff had borderline personality traits versus disorder, with a history of alcohol, marijuana and crystal meth abuse. (Tr. 420). Plaintiff's abuse of alcohol and crystal meth was noted to be in remission. (Tr. 420).

According to treatment notes dated May 25, 2005, plaintiff had recurrent major depressive disorder in remission along with a

history of borderline traits and marijuana abuse. (Tr. 419). Plaintiff was in a good mood. (Tr. 419).

On June 6, 2005, plaintiff was found to be suffering from major depressive disorder recurrent with borderline personality traits. (Tr. 418). Plaintiff discussed his anger at society with Dr. Conour. (Tr. 418). On June 22, 2005, plaintiff reported that he was working on possible employment. (Tr. 418). His relationship was going well. (Tr. 418). Plaintiff was not self-destructive on this visit. (Tr. 418). Treatment notes indicate that plaintiff had a history of major depressive disorder recurrent and a history of borderline personality traits. (Tr. 418). Plaintiff also had a history of marijuana and alcohol abuse. (Tr. 418).

## IV. **The ALJ's Decision**

The ALJ made the following findings:

1. The claimant was found to be disabled under the Social Security Act beginning on August 23, 1997.

2. The claimant has not engaged in substantial gainful activity since August 23, 1997.

3. The claimant's impairments do not meet or equal the requirements of any impairment contained in the Listing of Impairments in 20 CFR Part 404, Appendix 1 to Subpart P.

4. The impairments present as of January 14, 1999, the time of the most recent favorable medical decision that the claimant was disabled, were right sternoclavicular subluxation, overuse syndrome of the wrists, low back strain, schizoaffective disorder, dysthymic disorder and alcoholism.

5. There has been marked medical improvement in the claimant's impairments since January 14, 1999.

6. The medical improvement is related to the claimant's ability to work.

-18-

7.  The exceptions to medical improvement are not applicable.

8.  Although there has been medical improvement related to the claimant's ability to work, the claimant currently has a severe combination of impairments consisting of a depressive disorder with a history of borderline traits, marijuana abuse, hepatitis C, a history of alcohol, cocaine and methamphetamine abuse, and a history of right sternoclavicular subluxation, overuse syndrome of the wrists and low back strain.

9.  The claimant's allegations as to continuing disability are inconsistent with the record as a whole and are not credible.

10. The claimant cannot engage in heavy work, intellectually demanding work or work requiring more than occasional contact with the public. The claimant has the residual functional capacity to lift and carry up to 50 pounds occasionally and 25 pounds frequently and to sit, stand or walk throughout a work day (medium work) and to perform unskilled work that only involves occasional contact with the public.

11. The claimant cannot perform his past relevant work as a TV/radio repair person or electrical appliance repair person because it was skilled work.

12. The claimant was 48 years old on July 15, 2002 which is defined as a younger individual and is currently 52 years old which is defined as closely approaching advanced age. The claimant is a recent college graduate.

13. While the claimant performed skilled work, his skills cannot be utilized in other work because he is limited to unskilled work.

14. Given the claimant's age, education, past relevant work experience, and a residual functional capacity for the full range of medium work, Rules 203.27 and 203.22, of Table No. 3, of Appendix 2, Subpart P, Regulations No. 4, and 20 CFR 404.1569 indicate that a finding that the claimant is not disabled would be appropriate. Since the claimant has a non-exertional limitation to unskilled work with only occasional contact with the public, those Rules cannot direct the final result in this case.

16.[20] The vocational expert credibly testified that an individual with the claimant's residual functional capacity and vocational factors could perform medium work as a sandwich maker (# 317.664-010, 2500, 125,900) industrial cleaner (#381.687-018, 21,000, 1,210,600), laundry worker (#361.684-014, 900, 42,900) and light work as a folding machine operator (#208.685-014, 1700, 79,000), cleaner/housekeeper (#323.687-014, 7800, 409,000) and flat work finisher (#363.686-010, 400, 21,300). That is a significant number of jobs. The vocational expert's testimony satisfies the Commissioner's burden on the other work issue.

17. The claimant has not been disabled since July 15, 2002 because since then there have been a significant number of jobs in his state economy and the national economy that he could perform.

18. The claimant's disability ceased on July 15, 2002.

19. The claimant's entitlement to a Period of Disability and Disability Insurance Benefits ended with the close of September 2002, the second month after the month in which disability ceased.

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is

---

[20]The ALJ's findings do not include a finding numbered fifteen.

-20-

not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The claimant in a disability benefits case has a continuing burden to demonstrate that he is disabled." Nelson v. Sullivan, 946 F.2d 1314, 1315 (8th Cir. 1991). However, if "the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the...improvement...is related to the claimant's ability to work." Id.

To determine whether a claimant continues to be disabled, the Commissioner employs an eight-step sequential evaluation process pursuant to 20 C.F.R. §404.1594(f):

> [T]he [ALJ] must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Dixon v. Barnhart, 324 F.3d 997, 1000-01 (8th Cir. 2003).

**A.    Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   the ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.   third-party corroboration of the plaintiff's impairments; and

6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050

(8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.    Plaintiff's Allegations of Error**

Plaintiff contends that the ALJ failed to cite substantial evidence for the conclusion that plaintiff's psychological impairments had medically improved.  Plaintiff also asserts that the ALJ's findings of residual functional capacity are not supported by substantial evidence.  Specifically, plaintiff contends that the ALJ failed to ensure that the record was fully and fairly developed.

Plaintiff also argues that the ALJ failed to properly consider plaintiff's subjective complaints.  Plaintiff believes that the ALJ's conclusions regarding plaintiff's lack of credibility are erroneous.  Finally, plaintiff states that the hypothetical question offered to the vocational expert was improper and did not capture the concrete consequences of plaintiff's actual impairments.  Because of this error, plaintiff contends, the conclusions drawn from the vocational expert's testimony are not supported by substantial evidence.

**1.  Plaintiff's Medical Improvement**

The ALJ found that the evidence as a whole indicated that plaintiff's impairments had medically improved.  (Tr. 19).  In reaching this conclusion, the ALJ noted that the majority of

plaintiff's recent GAF scores were significantly higher than the GAF score of 50 given to plaintiff at the time of the previous favorable decision. (Tr. 19). Additionally, at the time of the decision awarding plaintiff benefits, plaintiff had poor concentration abilities. (Tr. 19). The ALJ noted that, while Dr. Conour found plaintiff still had a moderate impairment of concentration, Dr. Mades indicated that plaintiff had no problems in that area. (Tr. 19). The ALJ also considered that treatment notes frequently indicated that plaintiff's mood was euthymic and stable. (Tr. 19).

Plaintiff argues that, in reaching this decision, the ALJ ignored portions of the treatment notes indicative of severe mental illness and relied too heavily on GAF scores and notes from Dr. Mades, a consultative physician. Specifically, plaintiff pointed to treatment notes indicating that plaintiff had disorganized thought process, limited judgment, and a depressed mood. (Tr. 361). Plaintiff also argues that the medical notes continue to indicate that plaintiff has ongoing suicidal thoughts. Plaintiff also contends that his high GAF scores were primarily assigned by consultative physicians while treating physicians often gave plaintiff a lower GAF score.

"Medical improvement is defined as a decrease in the medical severity of the impairments present at the time of the most recent favorable medical condition." Nelson v. Sullivan, 946 F.2d 1314, 1315-16 (8th Cir. 1991). "The decision concerning whether or not an individual's condition has improved is primarily a factual

inquiry, which so often depends upon the credibility to be given to the various witnesses, a responsibility particularly given to the trier of fact." <u>Id.</u> at 1316.

The Court begins its analysis by examining the favorable decision issued on January 14, 1999. (Tr. 40-43). The decision considered Dr. Datta's opinion that plaintiff had little or no ability to follow work rules, use judgment, deal with work stresses, function independently, maintain concentration, and carrying out complex job instructions. (Tr. 41). The decision discounted a GAF score of 85 assigned to plaintiff during a consultative psychiatric examination and found that plaintiff's subsequent GAF score of 50 was more consistent with the majority of medical evidence. (Tr. 41).

Based on the record as a whole, the Court concludes that the medical severity of plaintiff's impairments has decreased since the time plaintiff was awarded benefits. Thus, there has been medical improvement as defined by the regulations. <u>See</u> 20 C.F.R. §404.1594(f). The most recent medical evidence demonstrates that plaintiff no longer has the limitations described in the favorable decision. On August 19, 2002, a psychiatric review form indicated that plaintiff had only mild limitations in maintaining concentration, maintaining social functioning, or performing activities of daily living. (Tr. 306-21). Dr. Mades likewise found that plaintiff had no concentration limitations. (Tr. 348). Treatment notes from plaintiff's treating physician, Dr. Conour, do not contradict this conclusion. Indeed, Dr. Conour indicated that

plaintiff had only moderate deficiencies of concentration. (Tr. 375). On the same form, when asked to identify plaintiff's symptoms, Dr. Conour did not mark "difficulty thinking or concentrating". (Tr. 374). These medical notes indicate that plaintiff's ability to concentrate has improved since plaintiff was awarded benefits.

Additionally, the medical professionals largely agree that plaintiff's insight and judgment is, at worst, fair. Dr. Conour described plaintiff's insight and judgment as good on September 12, 2003. (Tr. 379). On October 17, 2003, plaintiff's insight and judgment were "fair to good". (Tr. 380). Dr. Harvey also indicated that plaintiff's insight and judgment were "fair". (Tr. 371). Thus, it can no longer be said that plaintiff has little to no ability to use proper judgment.

Plaintiff's most recent GAF scores also support the conclusion that plaintiff's mental impairments have improved. Dr. Mades found that plaintiff's GAF score was 75 to 80, which indicates slight impairment. (Tr. 344-50). Dr. Harvey similarly assessed plaintiff's GAF score at 70. (Tr. 371). Dr. Conour most recently assigned plaintiff a GAF score of 65 to 70. (Tr. 373). Additionally, plaintiff's GAF score was assessed at 75 during plaintiff's treatment plan review on November 10, 2004. The Court acknowledges that plaintiff was also given GAF scores of 30 (Tr. 358), 40 (Tr. 383), and 50-60 (Tr. 358). The higher scores, however, are much more consistent with the medical evidence as a

whole, and support the ALJ's finding that plaintiff's impairments have improved.

Further, in Dr. Delaney's intake evaluation on July 17, 2003, plaintiff admitted that his depression had gotten better since 1997. (Tr. 382). Plaintiff claimed that he was "halfway" to those depression levels. (Tr. 382). It is also noteworthy that plaintiff's depression was often stated to be in remission. (Tr. 368-69, 378, 380, 384, 419). In Dr. Conour's last treatment notes, plaintiff was noted to have a history of major depression disorder. (Tr. 418). For all of these reasons, the Court is convinced plaintiff's impairments have medically improved.

### 2. Residual Functional Capacity

The Court will now examine plaintiff's argument that the ALJ's mental residual functional capacity assessment was erroneous. It is the duty of the ALJ to determine plaintiff's residual functional capacity, after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001). However, "[a] claimant's residual functional capacity is a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Thus, while the ALJ must consider all relevant evidence, at least "some medical evidence" must support the residual functional capacity conclusions of the ALJ. See Lauer, 245 F.3d at 704.

The ALJ found that, although his impairments had improved, plaintiff still suffered from severe impairments, including depressive disorder with borderline traits, marijuana abuse, hepatitis C, a history of alcohol, cocaine and methamphetamine

abuse, and a history of sternoclavicular subluxation, overuse syndrome of the wrists, and low back strain.[21] (Tr. 17, 25). The ALJ found that plaintiff retained the ability to lift and carry twenty-five pounds frequently and up to fifty pounds on occasion. (Tr. 23). The ALJ also found that plaintiff could sit, stand, or walk throughout a workday (medium work) and could perform unskilled work that involved occasional contact with the public. (Tr. 23-24).

Plaintiff contends that the ALJ erred in interpreting a limitation described by Dr. Mades in her medical notes. Dr. Mades wrote that the plaintiff "appears able to perform simple, manual tasks with limited interactions with others." (Tr. 348). The ALJ found that this statement was one of "capability" and not "limitation". (Tr. 23). The ALJ found that Dr. Mades was indicating that plaintiff was capable of those activities and not limited to them. (Tr. 23). Plaintiff argues that, instead of interpreting Dr. Mades's statement as one of capability and not limitation, the ALJ should have recontacted Dr. Mades to find out what Dr. Mades truly meant. Plaintiff points out that Dr. Mades also stated that "[o]ccasional interruptions may occur from mental disorder on a sustained basis" and that plaintiff has difficulty dealing with stress. (Tr. 348). Thus, plaintiff believes that the ALJ's residual functional capacity determination is inconsistent with Dr. Mades's findings.

---

[21]Although the ALJ found that plaintiff continues to have some physical impairments, the parties focus their discussion on plaintiff's mental impairments.

An ALJ is "not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The Court does not believe that the ALJ had a duty to seek additional information from Dr. Mades.  Instead, the Court finds that the record was fully and fairly developed.

Dr. Mades's statement that plaintiff could perform simple tasks with limited interactions with others is clearly, as the ALJ found, one of capability and not limitation.  First, it is relevant that, in that same document, Dr. Mades assessed plaintiff's GAF score at 75, which indicates only mild symptoms.  Dr. Mades also found that there was "no psychological impairment that would limit the claimant from engaging in sustained employment." (Tr. 348). Dr. Mades's opinion is not inconsistent with the ALJ's residual functional capacity determination.  Additionally, upon a review of the entire record, the Court finds that substantial evidence supports the ALJ's residual functional capacity determination.

### 3. Credibility Determination

The Court will now discuss plaintiff's assertion that the ALJ failed to properly consider plaintiff's subjective complaints.  The ALJ found that plaintiff was not fully credible. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Under Polaski, when assessing whether a claimant's subjective complaints are credible, the ALJ must consider all of the evidence, including claimant's work history and observations regarding: (1) claimant's daily activities; (2) the duration, frequency and intensity of the pain;

(3) the dosage, effectiveness and side effects of medication; (4) any precipitating and aggravating factors; and (5) claimant's functional restrictions. " Polaski, 739 F.2d at 1321. However, the ALJ is not required to discuss each Polaski consideration, so long as its considerations were acknowledged and examined prior to discounting the claimant's subjective complaints. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

The ALJ found that plaintiff was "less than candid in describing his work activity and substance abuse". (Tr. 20). The ALJ also considered the medical opinion that plaintiff was "malingering" when he threatened to kill himself after being arrested. (Tr. 20). The ALJ noted that, upon arriving at the hospital, plaintiff was immediately asymptomatic. (Tr. 20). The ALJ considered that medical professionals believed plaintiff may be feigning illness. (Tr. 21). The ALJ also noted that the medical records showed that plaintiff was doing fairly well, particularly in August and November, which plaintiff testified were his "worst" months. (Tr. 21). The ALJ also considered that plaintiff was not fully cooperative with his treatment. (Tr. 23). Finally, the ALJ indicated that plaintiff's poor work record reflects on his credibility. (Tr. 21).

The Court agrees that plaintiff's activities of daily living are somewhat inconsistent with his allegations of disability. Plaintiff earned his undergraduate degree and had started graduate school. (Tr. 465). He was living alone and functioning well. Plaintiff was capable of maintaining a relationship with his

girlfriend. (Tr. 476). These activities do not suggest that plaintiff suffers from a disabling mental condition.[22]

It is also relevant to plaintiff's credibility that medical professionals believed that plaintiff was feigning illness. Indeed, "malingering" was included in plaintiff's discharge diagnoses. The fact that plaintiff was immediately without symptoms upon being taken to the hospital instead of the jail reinforces this conclusion. The ALJ gave little weight to a contrary statement by Dr. Conour that plaintiff was not a malingerer, noting that Dr. Conour simply made a checkmark on a form without any discussion. "A treating physician's checkmarks...are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record." Cain v. Barnhart, 197 Fed. Appx. 531 at *1 (8th Cir. 2006). In this instance, medical records suggest that plaintiff was feigning illness on at least one occasion. This is relevant in assessing whether plaintiff's claims of disability are credible.

The ALJ also considered plaintiff's sporadic work history. Indeed, "a lack of work history may indicate a lack of motivation

---

[22]Defendant notes that plaintiff often indicated that he was attempting to start a new business and was looking for work. Ordinarily, this would indicate that a plaintiff did not view his own impairments as disabling, since he believes he can still work. In this instance, though, the medical records show that plaintiff was often imaginative in his entrepreneurial ideas. For instance, plaintiff once suggested that he could use solar energy to light up California. (Tr. 361). Given his mental impairment, the Court does not believe that plaintiff's stated desire to work necessarily indicates that he actually could work, or that he subjectively believed that he could.

to work rather than a lack of ability." <u>Pearsall v. Massanari</u>, 274
F.3d 1211, 1214 (8th Cir. 2001).  In this instance, however,
medical records reflect that plaintiff has suffered from depression
since he was a teenager.  Thus, it is not clear whether plaintiff's
lack of work history indicates a lack of motivation, or simply a
lack of ability.  Therefore, the Court does not believe that
plaintiff's work history necessarily detracts from his credibility.

However, the fact that plaintiff continued to smoke marijuana
daily, despite the urging of his physicians' to stop, does detract
from plaintiff's allegations of a disabling impairment.  Plaintiff
was constantly asked to stop using marijuana.  Indeed, Dr. Mades
indicated that plaintiff's prognosis was fair with appropriate
treatment and abstinence from substance use.  (Tr. 348).  However,
if plaintiff continued his substance use, plaintiff's prognosis was
guarded.  (Tr. 348).  Thus, plaintiff was aware that the successful
treatment of his mental impairment depended on, in part, abstention
from substance abuse.  By continuing to use marijuana daily,
plaintiff demonstrated a lack of commitment to his treatment.

Finally, the medical evidence in this matter is simply not
consistent with plaintiff's allegations of disabling impairment.
Between February 2002 and July 2003, plaintiff received mental
health treatment on only one occasion, when he was suspected of
feigning suicide to avoid arrest for marijuana possession.  This
lack of consistent treatment militates against a finding of
disability.  Further, while plaintiff was receiving treatment from
Dr. Conour, treatment notes indicate that he was largely doing

well. As discussed above, plaintiff was found to have only mild to moderate restrictions, and was frequently described as stable. Plaintiff's GAF scores have risen to a level inconsistent with plaintiff's allegations. Further, medical records show that plaintiff's symptoms were largely controlled by his medication. Plaintiff referred to Zoloft as a miracle medicine and wonder drug. If symptoms can be controlled by medication, they are not considered disabling. See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). For all these reasons, the Court concludes that the ALJ properly considered and applied the Polaski factors in assessing plaintiff's credibility. The substantial evidence throughout the record is inconsistent with plaintiff's subjective claims of a disabling mental impairment.

**4. Vocational Expert Testimony**

Plaintiff's final argument is that the hypothetical question posed to the vocational expert was flawed and did not capture the concrete consequences of plaintiff's impairments. The vocational expert testified in response to the following hypothetical question:

> If the hypothetical individual was limited to medium exertional work and it was unskilled and that same individual, but have occasional contact with the public, are there any jobs on a regional and national level that, that particular hypothetical individual could perform? (Tr. 484).

The vocational expert identified several jobs meeting this description. (Tr. 484-85). The ALJ then asked about a hypothetical individual limited to light work, but who could still only perform

unskilled work with occasional contact with the public. (Tr. 485).
The vocational expert testified that additional jobs were available
for that hypothetical individual as well. (Tr. 485).

Plaintiff's counsel then examined the vocational expert, and
asked her about Dr. Mades's statement that plaintiff could perform
simple, manual tasks with limited interactions with others.
Plaintiff's counsel assumed that Dr. Mades meant that plaintiff was
limited to "simple, one-two step work[23] from a mental point of
view". (Tr. 487). Counsel asked whether this limitation would
change any of the expert's answers to the hypothetical questions.
The expert testified that, if this one-two step limitation were
included, then all of the previous work identified by the expert
would be precluded.

Plaintiff asserts that the hypothetical question posed to the
vocational expert was flawed. Specifically, plaintiff contends
that the hypothetical questions did not incorporate limitations
discussed by Dr. Conour, and erroneously utilized "unskilled work"
as being synonymous with "simple work". Plaintiff argues that
"simple work" is a smaller subset of "unskilled work". Thus,
plaintiff urges, if the hypothetical had included plaintiff's
"simple work" limitation, the expert would have been able to
identify no such work existing in the national economy.

---

[23]To demonstrate what one-two step work refers to, the
vocational expert explained that an example of a two step process
would be picking up a pen or pencil (first step) and taking the
cap off (second step).

Plaintiff's argument is without merit. The medical records do not support the proposition that plaintiff is limited to one-two step work. As discussed above, plaintiff's interpretation of Dr. Mades's statement regarding simple work is inconsistent with the remainder of Dr. Mades's medical notes. It was not erroneous for the ALJ to exclude any "simple work" limitation, as defined by plaintiff's counsel, from the hypothetical questions.

Plaintiff also argues that the ALJ erred by not incorporating Dr. Conour's opinion that plaintiff would have moderate difficulties in social functioning, concentration and pace with one to two episodes of decompensation. (Tr. 375). Dr. Conour also opined that plaintiff's impairments would cause him to be absent from work two days per month. (Tr. 376). Plaintiff contends that, because the ALJ gave Dr. Conour controlling weight in an earlier portion of the decision, Dr. Conour's limitations should have been included in the hypothetical question. At the hearing, the vocational expert testified that if the limitations described by Dr. Conour were fully incorporated into the hypothetical question, then plaintiff would not be capable of perform his past, or other work. (Tr. 484).

In this case, the ALJ specifically noted Dr. Conour's statement that plaintiff had one or two repeated episodes of decompensation within twelve months of at least two weeks in duration. (Tr. 18). The ALJ indicated that this statement was not supported by the medical evidence as a whole. (Tr. 18). As the ALJ noted, plaintiff has had two hospitalizations since the time his

benefits were ceased. (Tr. 18). In both instances he showed quick improvement. (Tr. 18). Indeed, in one instance plaintiff was without symptoms almost immediately upon admission. (Tr. 368-69).

The ALJ also specifically referred to Dr. Conour's opinion that plaintiff had moderate impairments in maintaining concentration. (Tr. 18). Other evidence indicates that plaintiff has only a mild impairment in this area. (Tr. 18). The ALJ correctly found that plaintiff has no more than a mild to moderate impairment in his ability to concentrate. This finding is not inconsistent with the ALJ's hypothetical question.

Although the ALJ did not discuss Dr. Conour's opinion that plaintiff's impairment would require him to be absent from work two days per month, the Court does not believe this omission requires remand. The "ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Simply because an ALJ does not discuss a piece of evidence does not mean that it was not considered. See Id. Given that the ALJ specifically discussed Dr. Conour's findings from the January 2004 Mental Impairment Survey[24], the Court finds it "unlikely that the ALJ did not consider and reject [Dr. Conour's] opinion" that plaintiff would be required to miss two days of work per month. Id. Indeed, Dr. Conour's simple checkmark to this effect garners no support from the medical evidence in the record. See Cain v.

---

[24]It was in this same survey where Dr. Conour indicated that plaintiff had moderate limitations and suffered two episodes of decompensation within a twelve month period, two alleged limitations that the ALJ did discuss. (Tr. 375-76).

_Barnhart_, 197 Fed. Appx. 531 at *1 (ALJ may disregard treating physician's conclusory checkmark when it is not supported by medical evidence).

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." _Lacroix v. Barnhart_, 465 F.3d 881, 889 (8th Cir. 2006)(internal citations omitted). The Court finds that the ALJ appropriately included only those alleged impairments substantially supported by the evidence as a whole. Plaintiff's argument that the hypothetical question was flawed is without merit.

Substantial evidence, including the vocational expert's answer to the hypothetical question, supports the finding that plaintiff can perform other work existing in the national economy. (Tr. 484-85). Therefore, plaintiff is no longer disabled within the meaning of the Social Security Act and Regulations. _See_ 20 CFR 404.1594(f)(8).

## VI.  <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his complaint [#1] and his brief in support of complaint [#14] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_Carol E. Jackson_
CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 20th day of March, 2008.